Lee W. Walker and Besse L. Walker v. Commissioner. J. M. Hall and Vesta R. Hall v. Commissioner.
Lee W. Walker & Besse L. Walker v. Commissioner
Docket Nos. 5136, 5137.
United States Tax Court
1945 Tax Ct. Memo LEXIS 63; 4 T.C.M. (CCH) 947; T.C.M. (RIA) 45316; October 11, 1945
Allin H. Pierce, Esq., 111 W. Monroe St., Chicago, Ill., and Whitney Campbell, Esq., 135 S. La Salle St., Chicago, Ill., for the petitioners. Richard L. Greene, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax of $9,553.20 against the Walkers for 1941 and a deficiency of $8,983.01 against the Halls for that year. The husband in each case realized a gain in the taxable year of $20,000. Each reported it as a long-term capital gain from the sale of a capital asset and included one-half thereof in income. The only issue is whether or not the Commissioner erred in treating the entire gain as ordinary income. Findings of Fact Lee W. Walker and Besse L. Walker are *64 husband and wife. They filed a joint income tax return for 1941 with the collector of internal revenue for the first district of Illinois. J. M. Hall and Vesta R. Hall are husband and wife. They filed a joint income tax return for 1941 with the collector of internal revenue for the first district of Illinois. Walker, Hall, and James R. Cardwell had been associated in business together for many years as officers of Cardwell Westinghouse Company, which manufactured draft gears for railroad car couplings. Walker's duties were largely executive and administrative. He had no training or experience in mechanical or technical work. He never invented anything. Hall, an engineer, had supervision of manufacture. He had invented some things during the first world war, but for many years had devoted all of his time to his duties with Cardwell Westinghouse Company and had not licensed or sold any patents during that time. Cardwell owned stock in a corporation which operated a dehydrating plant. It was unsuccessful. He asked Walker to have a look at the plant in 1937 and Walker, with Cardwell's permission, took Hall with him. Hall thought that the methods used were much too costly and that any *65 good engineer could devise a better system, Walker encouraged him to do some experimenting during his spare time and arranged with Cardwell to have the latter pay any incidental expenses of this work. It was understood among the three that each would have a one-third interest in anything that was developed and that Cardwell would put up any money that was necessary. Hall began to experiment and devoted many of his evenings to this work. A small experimental plant was constructed at a cost of about $33,000. This plant was built by and belonged exclusively to Cardwell, but was used by Hall in developing his inventions. Hall obtained a number of patents. The three men decided to place the patents in a trust under which the three would be equal beneficiaries. They created a trust on December 15, 1938 naming their friend and business associate, Herbert E. Tucker, as trustee. All patents and patent applications obtained by Hall were transferred to the trust. The chief purpose of forming the trust was to keep the property from being divided in case any of the three should die or should desire to dispose of his interest separately. Hall continued to experiment with the dehydration processes *66 for several years. A few corporations and others learned of his work and sent representatives to the experimental plant to watch the processes. Hall endeavored to improve the process so that it would dehydrate the various substances on which tests were made. Hall would apply for a supplemental patent as he developed some refinement or improvement in the original process and he would then assign whatever he obtained to the trustee. The whole process represented by the patents and applications was in the process of development until the fall of 1941. The Jerpe Commission Company of Omaha, Nebraska, purchased some dehydration equipment from Cardwell personally, and, in August 1941, obtained from the trust a non-exclusive, non-transferable license to operate its plant, using the processes covered by the patents owned by the trust. No charge was made for this license, but a royalty for each pound of product dehydrated by the licensee was to be paid to the trustee. The Jerpe plant was begun in September 1941, but was not completed until 1942. The trust never received any royalties. It was decided in the fall of 1941 that a wholly owned subsidiary of Cardwell Westinghouse Company would *67 be formed for the purpose of acquiring the dehydration process developed by Walker and using it in a business to be carried on by that new company. The new company, Drying and Concentrating Company, was formed. Walker, Hall, and Cardwell each offered to sell to that company his onethird beneficial interest in the trust for $20,000. These offers were accepted by the new company on October 1, 1941. Written assignments were made by each of the three parties on October 2, 1941, transferring his beneficial interest in the trust to the new company. The new company paid each of them $20,000 on October 31, 1941 for the interest thus transferred. The trust continued for a short while with the new company as the sole beneficiary and then it was terminated and the patents and applications were transferred to the new company. No income or payment of any kind for the use or sale of any equipment, license, or patent was ever received by the trustee, by Hall, or by Walker at any time prior to the sale just described. The trust had no office, no books or records, no employees, no customers, no stock in trade, and no income from the time of its creation on December 15, 1938 until the petitioners *68 here sold out their beneficial interests in October 1941. The trust never advertised, never held itself out as being in any trade or business, never operated any business, never filed any income tax return, and never claimed or was allowed any depreciation on anything which it owned. Cardwell paid all of the expenses of the trust during this period. They amounted to $6,783.24 and consisted of fees paid to patent attorneys in connection with the acquisition of the patents. Cardwell, in a separate transaction, sold the experimental plant to the Drying and Concentrating Company in the fall of 1941. The beneficial interests which the petitioners owned in the trust above described from December 15, 1938 until October 1941 were capital assets. Those interests and the patents and applications owned by the trust were not stock in trade of these taxpayers, or property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business, or property used in the trade or business of these taxpayers of a character which is subject *69 to the allowance for depreciation. The petitioners, on their returns for 1941, reported that they had made long-term capital gains of $20,000 each from the sale in October 1941 for $20,000 of property described as "Patent (1/3 Int.)" which had been acquired on December 15, 1938 at no cost. They had carried $10,000 of this gain into income. The Commissioner, in determining the deficiencies, included the entire gain of $20,000 in income. Opinion MURDOCK, Judge: The respondent has struggled to show that the property sold by these petitioners at an admitted gain of $20,000 was not a capital asset, but the facts in the case are against him. He urges us to disregard the trust which was created on December 15, 1938. But there is no sufficient reason for disregarding that trust. It was not formed to evade income taxes and there was no sham about it. The petitioners interests in that trust were capital assets within the definition of that term in section 117(a), I.R.C. applicable to the year 1941. Those interests were property held by the taxpayers. They were not stock in trade of the taxpayers or other property of a kind which would properly be included in the *70 inventories of the taxpayers if on hand at the close of the taxable year, or property held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business, or property used in their trade or business of a character which would be subject to any allowance for depreciation. Furthermore, the respondent would not be benefitted by a disregard of the trust. In that case these petitioners would be regarded as owning each an undivided one-third interest in the patents and applications which together made up the dehydrating process invented by Hall. Those undivided interests would be property held by these taxpayers. They would not represent stock in trade of the taxpayers or other property of a kind which would properly be included in the inventory of the taxpayers if on hand at the close of the taxable year, or property held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business, or property used in their trade or business of a character which was subject to the allowance for depreciation during their ownership of that property. There was no trade or business carried on in connection with these patents and applications *71 up to the date of the sale. Hall, with the financial assistance of Cardwell, and with assistance from Walker, was endeavoring during all of this period to develop his process to the point where it would be commercially valuable; that is, to the point where it could be sold or used in a business for profit. The process represented by the patents and applications was not being used commercially during that period. Hall and Walker were not in the business of selling patents and patent applications or processes to customers. They hoped to sell something eventually, but until their development of the process was complete, they had nothing for sale. They were perfectly willing, indeed glad, to demonstrate the process and to try it out on various commodities offered for dehydration. They wanted to see if it would work on such products or if they could make it work, and if it worked or could be made to work satisfactorily, they were pleased. But those who observed the operation of the process, and who offered sample products for test under the process, were not solicited by the petitioners as customers for any wares then for sale by the petitioners. The petitioners may have thought that *72 those who observed the process or who offered commodities for test under the process might be potential customers at some time for something which might be developed, but for the time being they had nothing for sale. The trust granted a limited license to the Jerpe Commission Company, Inc. while the petitioners were beneficiaries, but neither the petitioners nor the trust ever received any royalties under this license. Neither the trust nor the petitioners were in the business of issuing licenses under the process covered by the patent. A plan was being formulated for the transfer of the beneficial interests in the trust to a new company, a wholly owned subsidiary of Cardwell Westinghouse, which was to go into some kind of business based upon the ownership of this process. Cardwell, who had put all of the money for the expriements, apparently wanted to see what the process would do in actual commercial operation. The license to Jerpe was granted in connection with Cardwell's sale of some drying equipment to Jerpe. He mentioned in one of his letters to Jerpe that it had been of help in developing the process. The granting of this one license did not serve to change the property, which *73 these petitioners held, from a capital asset to a noncapital asset. Decision will be entered under Rule 50.